GUSTAVO BONILLA

VERSUS

VERGES ROME ARCHITECTS
- A PROFESSIONAL
ARCHITECTURAL
CORPORATION, PIVOTAL
ENGINEERING, LLC; STEVEN
HANNAH ROME AND JAMES
E. AMEDEO

* NO. 2022-CA-0802

*

* COURT OF APPEAL

* FOURTH CIRCUIT

* STATE OF LOUISIANA

* * * * * * *

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2019-02366, DIVISION "G-11"
Honorable Robin M. Giarrusso, Judge
* * * * * *
**Judge Roland L. Belsome**
* * * * * *

(Court composed of Judge Roland L. Belsome, Judge Joy Cossich Lobrano, Judge
Tiffany Gautier Chase)

**LOBRANO, J. CONCURS IN THE RESULT**

Caleb H. Didriksen, III
Erin Bruce Saucier
Carl A. "Trey" Woods, III
DIDRIKSEN SAUCIER & WOODS
3114 Canal Street
New Orleans, Louisiana 70119

        COUNSEL FOR PLAINTIFF/APPELLANT

Terrence L. Brennan
Kelly E. Theard
Brian S. Schaps
Juan J. Miranda
DEUTSCH KERRIGAN, LLP
755 Magazine Street
New Orleans, Louisiana 70130

        COUNSEL FOR DEFENDANT/APPELLEE

                                        **AFFIRMED**
                                        **May 11, 2023**

RLB
JCL
TGC

This action arises out of a workplace accident. The plaintiff, Gustavo Bonilla ("Mr. Bonilla"), appeals the September 23, 2022 judgment granting a motion for summary judgment in favor of Morphy Makofsky, Inc. ("MMI"). For the reasons that follow, we affirm.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

Mr. Bonilla filed a petition for damages alleging that on March 7, 2018, he was injured while working as a subcontractor on a construction project ("Project") at the Allie Mae Williams Multiservice Center ("Center"). At the time of the accident, the Center was being renovated by its owner, the City of New Orleans ("City"). In connection with the renovations, the City entered into a contract ("Construction Contract") with Tuna Construction, LLC ("Tuna"), as the general contractor. Tuna subcontracted with Mr. Bonilla's employer, Meza Services, Inc. ("Meza"), to perform demolition services on the Project. The City also executed a Professional Service Agreement ("Design Contract") with Verges Rome Architects, APAC ("VRA") as the "Consultant" on the Project, for professional

1

design and contract administration services.  VRA retained MMI to provide certain engineering services.

At the time of the accident, Mr. Bonilla was directed by his employer to demolish a vault that was located on the second floor of the Center.  The vault is described in the record as a ten-foot by ten-foot cinderblock room, with a nine-foot high concrete slab ceiling.  Mr. Bonilla testified in his deposition that after demolishing most of one of the side walls of the vault and a smaller section of the front wall, he was instructed to stand on top of the vault's concrete ceiling in order to demolish it with a hydraulic jackhammer.

Shortly after beginning that task, the entire vault structure collapsed.  At the time, Mr. Bonilla was wearing a harness, which he tethered to a pipe above the vault.  Although the harness somewhat broke his fall, Mr. Bonilla sustained neck and back injuries.

Mr. Bonilla initially filed suit against VRA, and VRA's Vice President, Stephen Hannah Rome ("Mr. Rome").  MMI was named as a defendant in a supplemental and amending petition. [1]  Generally, as to both MMI and VRA, the petition alleges negligence in the preparation and approval of the design plans and specifications, the failure to design and/or require support for the area being demolished, and the failure to monitor and supervise the execution of the plans to ensure safety at the jobsite.

MMI filed a motion for summary judgment asserting that pursuant to the relevant contracts governing the Project, MMI did not owe a duty to oversee, supervise or maintain the construction site.  In support of the motion for summary

---

[1] Pivotal Engineering, LLC and James E. Amedeo, were also named as defendants but were voluntarily dismissed.

judgment, MMI submitted the affidavit and deposition of its President, Jamie Saxon ("Mr. Saxon"), the Construction Contract between the City and Tuna, the General Conditions included in the Construction Contract, the Design Contract between the City and VRA, MMI's correspondence with VRA setting out the Revised Proposal for MMI's scope of work on the Project. MMI later supplemented its motion for summary judgment with the deposition testimony of Mr. Rome and Anthony Taffaro ("Mr. Taffaro"), both architects with VRA.

In opposition to MMI's motion for summary judgment, Mr. Bonilla argued that there were outstanding issues of material fact as to whether MMI owed a duty to provide a safe work environment and whether MMI's design plans were in accordance with industry standards. To support that position, Mr. Bonilla introduced his own deposition testimony, together with the depositions of Mr. Taffaro, Mr. Rome, and Mr. Saxon, and the affidavits and reports from expert witnesses Jerry L. Householder ("Mr. Householder") and James P. Labarre ("Mr. Labarre"). After submission of evidence and oral argument, the trial court rendered judgment in favor of MMI on September 23, 2022.[2] Mr. Bonilla's timely appeal followed.

**SUMMARY JUDGMENT PRINCIPLES AND STANDARD OF REVIEW**

"The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action" and the favored procedure "shall be construed to accomplish these ends." La. C.C.P. art. 966(A)(2). "After an opportunity for adequate discovery, a motion for summary judgment shall be

---

[2] Prior to the ruling in favor of MMI, judgment was rendered on June 30, 2022, granting a similar motion for summary judgment in favor of VRA. While the matters were consolidated for purposes of oral argument, the ruling as to VRA is addressed in a separate appeal before this Court. *See* 2022-CA-0625.

3

granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law." La. C.C.P. art. 966(A)(3).

As this Court recognized in *Bercy v. 337 Brooklyn, LLC*, 2020-0583, pp. 3-4 (La. App. 4 Cir. 3/24/21), 315 So.3d 342, 345, *writ denied*, 2021-00564 (La. 6/22/21), 318 So.3d 698,

> La. C.C.P. art. 966(D)(1) provides that on a motion for summary judgment, although the burden of proof rests with the mover, if the mover will not bear the burden of proof at trial, the mover must only point out the absence of factual support for one or more elements essential to the adverse party's claim. The burden then shifts to the adverse party who has the burden to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law.

A genuine issue of material fact is one as to which reasonable persons could disagree, "[i]f on the state of the evidence, reasonable persons could reach only one conclusion, there is no need for trial on that issue[,]" and summary judgment is appropriate. *Smith v. Our Lady of the Lake Hosp., Inc.*, 93-2512, p. 27 (La. 7/5/94), 639 So.2d 730, 751. "A fact is material when its existence or nonexistence may be essential to the plaintiffs [sic] cause of action under the applicable theory of recovery; a fact is material if it potentially insures or precludes recovery, affects a litigant's ultimate success, or determines the outcome of the legal dispute." *Chapital v. Harry Kelleher & Co., Inc.*, 2013-1606, p. 5 (La. App. 4 Cir. 6/4/14), 144 So.3d 75, 81(quotation omitted). Whether a fact is material is a determination that must be made based on the applicable substantive law. *Roadrunner Transp. Sys. v. Brown*, 2017-0040, p. 7 (La. App. 4 Cir. 5/10/17), 219 So.3d 1265, 1270 (citing *Smith*, 93-2512, p. 27, 639 So.2d at 751).

4

Finally, it is well-settled that "[i]n determining whether an issue is genuine for purposes of a summary judgment, courts cannot consider the merits, make credibility determinations, evaluate testimony or weigh evidence." *Robertson v. Kearney Cos., Inc.*, 2020-0605, p. 4 (La. App. 4 Cir. 3/25/21), 315 So.3d 931, 935 (quoting *Estate of Alix v. Wells*, 2007-0503, p. 3 (La. App. 4 Cir. 12/12/07), 974 So.2d 63, 65).

**LAW AND ANALYSIS**

In support of its motion for summary judgment, MMI asserted that pursuant to its agreement with VRA, as represented in the November 28, 2017 Revised Proposal, MMI's scope of work on the Project was specifically limited to the following:

- Partial slab demolition and replacement for new plumbing services.
- Modifications to the existing elevator framing that maybe required as part of the elevator replacement.
- New second floor penetrations as required.
- New exterior canopy and foundations on the north side of the building.
- At the north/east corner of the building provide new lintels and supplemental framing for the removal of the brick in the lower part of the wall and installation of new storefront.
- New 2nd floor vestibule.
- Support framing for new mechanical equipment at the penthouse.

Moreover, in connection with the scope of work on the Project, Mr. Saxon, MMI's President, attested to the following in his affidavit:

- MMI entered into an agreement with VRA to provide certain limited engineering services related to the Project.
- MMI's scope of services, as revised by the November 28, 2017 Proposal, was limited to: 1) partial slab demolition on the first floor and replacement for new plumbing service; 2) new second floor penetrations; 3) new exterior canopy and foundations on the north side of the building; and support framing for new mechanical equipment at the penthouse.

5

- MMI's services did not include any design or engineering related to the demolition of the second-floor vault or any other demolition on the second floor of the Project.
- Pursuant to the relevant contract documents: 1) Tuna, not MMI, was responsible for the means, methods, and safety precautions; 2) MMI's site visits and observations 'shall not be construed as supervision of actual construction (MMI's site visits began on April 19, 2018, more than a month after the incident); 3) Tuna was responsible for the 'strength and safety of all scaffolding, staging, and hoisting equipment and for temporary shoring, bracing and tying'; and 4) MMI did not owe a duty to maintain, monitor or ensure Mr. Bonilla's safety.

Mr. Saxon testified in his deposition that MMI had no involvement in the demolition of the vault. Rather, he stated that MMI provided only a general structural note, which told the contractor to shore and brace all existing framing as required to achieve the design intent on the structural drawings. He explained that the methods used for demolition would be up to the contractor.

Mr. Saxon further testified that MMI performed no site supervision work for VRA. Rather, they only did site observations to look at the work performed by the contractor to ensure that the work was in general compliance with the design intent. He stated that MMI was not at the site on the day of Mr. Bonilla's accident. In fact, MMI's first site visit was more than a month after the accident occurred.

In further support of its assertion that Tuna was responsible for the means and methods of construction/demolition and for overseeing safety on the Project, MMI relied on the General Conditions of the Construction Contract, which provide, in part:

> 4.7 The Contractor shall direct the work using his full attention and shall be entirely responsible for all construction means and methods.
>
> 10.1 The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs. He shall take all reasonable precautions for the safety and shall take all reasonable steps to prevent damage, injury, or loss of the work itself and all material and equipment incorporated; or property at the site or

6

adjacent thereto, and all employees or other persons affected by the work.

10.3  The Contractor shall erect and maintain, as required by existing conditions and progress of the work, all reasonable safeguards for safety and protection….

10.6  The Contractor shall be responsible for the adequate strength and safety of all scaffolding, staging and hoisting equipment and for temporary shoring, bracing and tying.

10.8 The Contractor shall designate a responsible member of its organization at the site whose duty shall be the prevention of accidents.  This person shall be the Contractor's superintendent unless otherwise designated by the Contractor in writing to the Owner and the Consultant.

MMI further maintained that the testimony of VRA architects, Mr. Taffaro and Mr. Rome reiterated that under the General Conditions, the contractor determines the methods he uses to do the work, and he determines and controls safety conditions.  Mr. Rome testified that the plans for demolition of the vault (drafted by VRA) provided only a general note to the contractor to completely remove the existing vault and associated fixtures.  It was up to the contractor to decide how it was to be taken drown.  Pursuant to the Construction Contact and the Design Contract, the contractor determined how the work was to be done.

Mr. Taffaro testified that Section 3.6 of VRA's Project Manual (included in the Design Contract with the City) provided that when cutting or patching, the contractor would "provide temporary support of work to be cut."  He explained this to mean that if there was any work to be cut, the contractor would be required to provide support in order to prevent anything from falling to the floor, and causing damage.  He further explained that the Project Manual stipulated that during demolition, the contractor was required to use methods least likely to cause damage to the elements retained or adjoining construction.  It also provided that

"[i]n general, the contractor was to "use hand or small power tools designed for sawing and grinding, not hammering and chopping." Mr. Taffaro acknowledged that these provisions of the Project Manual would have applied to the elements that were going to be removed from the vault.

Mr. Taffaro also confirmed that Section 3.1(E) of the Project Manual required the contractor to engage its own engineer to perform an engineering survey to determine whether removing any element of the building might result in structural deficiency or unplanned collapse during demolition.[3] He did not know if Tuna engaged an engineer.

Mr. Bonilla testified in his deposition that his supervisor told him to stand on the concrete roof of the vault and break it up with a jackhammer. At that time, some of the vault's walls were already broken down. Mr. Bonilla explained that while operating the jackhammer, the concrete slab ceiling collapsed. After landing in a squatting position, the jackhammer pulled him onto his side. Mr. Bonilla stated that as a result of the accident he has undergone back surgery and will need surgery on his neck.

In opposition to MMI's motion for summary judgment, Mr. Bonilla relied heavily on the fact that Mr. Taffaro was present at the jobsite on the day of the accident and took photographs of Mr. Bonilla and two co-workers in the process of demolishing the vault. In particular, one photograph shows Mr. Bonilla standing on scaffolding, with his hand on the roof of the vault. Two other workers are shown standing on the floor below him. The photograph also shows the vault with much of the side wall and a smaller portion of the front wall demolished. The door

---

[3] Section 4.30 of the Construction Contract's General Conditions states that "[t]he Contractor shall provide competent engineering services to execute the work in accordance with the Contract requirements."

to the vault is partially open. Visible on the floor immediately adjacent to the vault are large pieces of rubble, evidently from the demolition of the vault's cinderblock walls. Mr. Taffaro was no longer onsite when the accident occurred.

Mr. Taffaro acknowledged in his deposition that there were no temporary supports in place on the vault when he took the photographs. He further stated that he could not see inside the vault to tell if there were temporary supports on the inside. Mr. Taffaro explained that he could not say if temporary supports were necessary because he did not know how the contractor proposed to demolish the vault. Mr. Taffaro did not question the lack of temporary shoring to anyone at the time.

Mr. Taffaro testified that he did not see anything wrong or unsafe in what the workers were doing at the time he took the photographs. Mr. Taffaro explained that he knew they were required to demolish the entire vault, but he did not know whether they were taking it down at that point in time. He made no inquiry. When asked what he would do if he did see anything unsafe, Mr. Taffaro explained that he would discuss the matter with the contractor's superintendent.

Mr. Bonilla introduced the affidavits and reports of expert witnesses, Mr. Householder (a civil and structural engineer and general contractor) and Mr. Labarre (an architect and general contractor).

After reviewing the photographs taken by Mr. Taffaro, Mr. Householder opined that:

> It is clear to me that even a layman who is not a trained design professional should have recognized that partially removing the walls without providing substitution supports made the ceiling slab unstable. There is no evidence in Taffaro's pictures of substitute supports in place. It should have been obvious to everyone that it was more dangerous to jackhammer on the ceiling slab after having remove parts of two of its support walls.

9

We note that Mr. Householder did not reference MMI by name in his report. Rather, he stated generally that "[a]ny trained Architect or Engineer" should have recognized that demolishing the ceiling without support would likely result in the ceiling's collapse.

Mr. Labarre, did not render an opinion specific to MMI. However, as to VRA, he stated:

> While agreeing that VRA is not responsible for means or methods, as a licensed architect with a master's in architecture, I offer that Mr. Taffaro has some basic knowledge of structures and as evidenced by the photographs, if demolition were to continue on the vault with no temporary supports, there was a potential for problems.

On appeal, Mr. Bonilla argues generally that genuine issues of material fact remain, and that MMI's plans, with regard to shoring and safety were wholly inadequate. More specifically, Mr. Bonilla sets forth only one assignment of error, asserting that the trial court overlooked duties owed by an architect and engineer to the general public, created by Louisiana jurisprudence and statute, asserting that the trial court did not evaluate La. R.S. 38:2216, which prohibits a limitation on liability on architects and/or engineers in contracts with public bodies. He argues that La. R.S. 38:2216 renders null and void any hold harmless agreement which purports to shelter an architect or engineer from damages. The statute provides in pertinent part:

> G. It is hereby declared that any provision contained in a public contract, other than a contract of insurance, providing for a hold harmless or indemnity agreement, or both,
>
> (1) From the contractor to the public body for damages arising out of injuries or property damage to third parties caused by the negligence of the public body, its employees, or agents, or,
>
> (2) From the contractor to any architect, landscape architect, engineer, or land surveyor engaged by the public body for such damages caused

10

by the negligence of such architect, landscape architect, engineer, or land surveyor

is contrary to the public policy of the state, and any and all such provisions in any and all contracts are null and void.

In response to Mr. Bonilla's specific assignment of error regarding La. R.S. 38:2216, MMI submits that the statute was never referenced in the trial court proceedings. Thus, it is not properly preserved for appeal. Moreover, MMI argues that the statute is inapplicable here because it applies only to nullify indemnification and hold harmless provisions requiring the contractor to hold harmless an architect or engineer for their own acts of negligence. MMI points out that the relevant contracts on the Project contain no such provisions.

We agree that La. R.S. 38:2216 is not applicable in this case. The contracts at issue here contain no provisions that would require Tuna to indemnify or hold harmless MMI for its own negligence. Rather, the contracts simply delineate the duties and responsibilities of each of the parties involved in the Project. Mr. Bonilla's reliance on La. R.S. 38:2216 is misplaced.

The pertinent issue before us in this appeal is whether the express provisions of the relevant contracts imposed a duty on MMI. It is well established in our jurisprudence that "[w]hether a duty is owed is a question of law; whether defendant has breached a duty is a question of fact." *Brewer v. J.B. Hunt Transp., Inc.*, 2009-1408, p. 14 (La. 3/16/10), 35 So.3d 230, 240.

As this Court held in *Black v. Gorman-Rupp*, 2000-1223, p. 5 (La. App. 4 Cir. 7/11/01), 791 So.2d 793, 796 (quoting *Yocum v. City of Minden*,

26,424, pp. 3-4 (La. App. 2 Cir. 1/25/95), 649 So.2d 129, 132), "[i]n determining the duty owed to an employee of a contractor by an engineering firm also involved in the project, the court must consider the express provisions of the contract between the parties." *See also Young v. Hard Rock Constr., L.L.C.*, 19-0484, p. 7 (La. App. 5 Cir. 3/17/20), 292 So.3d 178, 184.

In *Black,* the Sewerage and Water Board of New Orleans entered into a contract with T.L. James Construction Co. ("T.L. James") as the general contractor, and Pepper & Associates ("Pepper") as the engineer on a drainage project. Mr. Black, an employee of T.L. James, was killed when a pump fell into the excavation site. The petition for damages alleged Pepper's negligence in failing to properly supervise the work and in failing to provide a safe job site. Pepper moved for summary judgment arguing that their contract with the Sewerage and Water Board was for engineering services to check that the work complied with the contract requirements. Additionally, Pepper asserted that they had no responsibility for site safety and had no knowledge of the alleged dangerous condition concerning the placement of the pump. The trial court granted summary judgment in favor of Pepper. On appeal, this Court affirmed, finding as follows:

> The only way a legal duty to act can arise from the facts before this Court, is if the contract between the Sewerage and Water Board and T.L. James and the Sewerage and Water Board and Pepper lead to the conclusion that Pepper was responsible for performing those activities that appellant alleges that Pepper failed to perform. After a careful review of the contracts we are of the same opinion as the trial court that Pepper did not have a contractual obligation to supervise construction or site safety. The mere fact that Pepper was involved in the construction process and had contractual duties to the Sewerage and Water Board does not create an all encompassing duty to protect everyone from every risk which could be encountered during the

12

course of the project. To defeat the summary judgment the plaintiff cannot merely allege that Pepper owed a duty to Ronnie Black, but must demonstrate some basis in law for the imposition of this duty. In the absence of such a duty there can be no liability on the part of Pepper.

*Black,* 2000-1223, p. 5, 791 So.2d at 795-96.

In *Young*, the plaintiff was injured on a construction site at East St. John High School when the walls of a trench in which he was laying drainage pipe collapsed. He sued both his employer, Hard Rock Construction of Louisiana, LLC ("Hard Rock"), and All South Consulting Engineers, L.L.C. ("All South"), the engineer on the project. The trial court granted summary judgment in favor of All South, finding:

Here, the American Institute of Architects contract utilized in determining the roles of the parties and the duties between them used clear and explicit terms. Section 4.2.2 states that the engineer will not have "control over, charge of, or responsibility for ... safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities[.]" *All South Ex. C, § 4.2.2 at 21*. It is apparent that the parties intended to hold only one party, Hard Rock Construction, liable for safety precautions. Indeed, the same contract provides that the contractor is "solely responsible" for all instrumentalities of the construction job. *All South Ex. C., § 3.3.1 at 14-15*. The contract intends for the engineer to be in charge of determining the date of substantial compliance, preparing change orders, reviewing contractor submissions, and keeping the owner informed on the progress of the work.

*Young*, 2019-0484, p. 5, 292 So.3d at 183.

On appeal, citing our holding in *Black*, the Court in *Young* affirmed the granting of summary judgment in favor of All South, reiterating that the duty owed to Mr. Young was governed by All South's contract with the School Board. The Court noted that pursuant to the contract, Hard Rock was solely responsible for the means and methods of construction and for its workers' safety. Thus, the Court found no genuine issues of material fact as

13

to All South's non-liability to Mr. Young under the express provisions of the contract.

We find *Black* and *Young* analogous to the present case, as Tuna, not MMI, had the stated contractual duty for the means and methods of construction and for safety. Additionally, in *Black* and *Young*, as we find here with MMI, there was no evidence introduced to demonstrate that the engineer was aware of any unsafe conditions on the jobsite.

Citing *Lathan Co., Inc. v. State*, 2016-0913, p. 8 (La. App. 1 Cir. 12/6/17), 237 So.3d 1, 6, Mr. Bonilla maintains that the legal question of whether a duty exists is only appropriately addressed by summary judgment when no factual dispute exists and no credibility determinations are required. In this case, Mr. Bonilla argues that both factual disputes and credibility determinations are at issue. Thus, he maintains that summary judgment is not appropriate. We disagree.

As to MMI, we find no genuine issues of material fact and no credibility determinations to be made. As a threshold matter, we note that the arguments made throughout Mr. Bonilla's brief to this Court conflates the roles and duties of MMI and VRA. However, the record clearly demonstrates that MMI's role in the Project was limited to its specified scope of work as a consultant for VRA. As previously explained, that role did not include any demolition drawings or specifications for the vault. Additionally, pursuant to the contracts at issue here, MMI was not responsible for the means and methods of construction and for site safety.

We note that Mr. Bonilla relies heavily on Mr. Taffaro's visit to the site and the photographs taken on the date of the accident. However, under

the circumstances, Mr. Taffaro's observations cannot be imputed to MMI. The record is clear that Mr. Taffaro worked for VRA, not MMI. Additionally, there is no evidence in the record to show that MMI was aware of how the vault was being demolished. It is undisputed that MMI's site visits did not begin until more than a month after the accident.

Finally, we note that the two expert reports submitted by Mr. Bonilla make no specific reference to any negligence or breach of duty on the part of MMI. The experts do not state, as Mr. Bonilla asserts, that MMI's demolition plans were inadequate.

**CONCLUSION**

Based on our *de novo* review of the record, and in considering the contracts at issue here, we find that Mr. Bonilla has shown no basis in law for the imposition of a duty on MMI. Furthermore, we find that no genuine issues of material fact exist, and MMI is entitled to judgment as a matter of law. Accordingly, we affirm the trial court's granting of summary judgment in favor of MMI.

**AFFIRMED**